IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD MATTHEW BUCKLEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 3901 |
| | ) | |
| PEAK6 INVESTMENTS, LP, PEAK6 MEDIA LLC, PEAK6 LLC, PEAK6 ONLINE LLC, JENNIFER JUST, and MATT HULSIZER | ) ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On June 23, 2010, plaintiff Matthew Edward Buckley ("Buckley") filed a seven-count complaint against PEAK6 Investments, LP, PEAK6 Media LLC, PEAK 6 LLC, PEAK6 Online LLC, Jennifer Just, and Matt Hulsizer, asserting claims under Illinois law for tortious interference with contractual relations (Counts 1 & 5), tortious interference with a prospective business relationship (Count 2), intentional infliction of emotional distress (Count 3), and breach of contract (Count 4). Dkt. No. 1 ("Complaint"). The complaint also alleged violations of the Uniform Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4333 (Counts 6-7). Currently before the court is defendants' Motion for Summary Judgment (Dkt. No. 71) seeking dismissal of all counts. Also before the court is Buckley's Motion for Partial Summary Judgment on Plaintiff's Claims for Tortious Interference (Dkt. No. 75), asking for judgment in his favor on Counts 1 and 2. For the reasons stated below, defendants' motion is granted and plaintiff Buckley's motion is denied.

1

BACKGROUND

I.   Buckley's Military Service While at PEAK6

PEAK6 Investments, LP ("PEAK6"), a financial services firm, hired Edward Matthew Buckley, a former Navy pilot, to be the CEO of its subsidiary PEAK6 Media LLC in February 2006. Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶¶ 1, 25. At that time, Buckley was serving in the naval reserves, a position that required his periodic absence from PEAK6. To accommodate such absences, PEAK6 had a "Vacation Time Policy" which allowed employees to take military leave for up to fifteen consecutive days per year with pay. Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. H, at 3. The policy gave an employee two options for pay while on military leave. *Id.* First, he could collect his full salary minus the amount of his military pay, and preserve all of his vacation time. *Id.* Alternatively, he could choose to use vacation time for half of up to fifteen days of military leave and collect his full salary. *Id.* For any military leave beyond fifteen days, the employee would be paid only if he chose to use his vacation time. *Id.*

Buckley's service in the naval reserves lasted until December 2006. Dkt. No. 92 ("Def.'s Resp. to Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 2. According to PEAK6, all of Buckley's requests for paid military and vacation leave were approved during that time, and Buckley received his full salary in 2006 without any deductions for time off. Dkt. No. 73 ("Def.'s Local R. 56.1(a)(3) Stmt.") ¶¶ 43, 44, 46. Buckley agrees that none of his requests were denied, although he asserts that they were not affirmatively approved. Dkt. No. 92 ("Def.'s Resp. to Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶¶ 43, 44.

Buckley also points to additional evidence showing that PEAK6 was not always helpful with respect to his military service. According to Buckley, PEAK6 disapproved of his military service

and conditioned his continued employment on his quitting the reserves. Dkt. No. 84 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 3. In addition, PEAK6 sent emails to Buckley and expected him to work while he was on military leave, and also told him that he was taking too much leave. *Id.* ¶¶ 4, 6.

II.   The Non-Competition Agreement and Buckley's Employment at Investools

Buckley's employment at PEAK6 continued until July 10, 2009. Dkt. No. 92 ("Def.'s Resp. to Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 9. The parties agree that Buckley was thereafter subject to a non-competition agreement, although they disagree about which agreement applied. It is undisputed that Buckley signed a first agreement in April 2007 ("2007 Agreement"), shortly after being hired. Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶ 27, and PEAK6 maintains the 2007 Agreement is still in force. Buckley asserts, however, that he signed another agreement in 2009 ("2009 Agreement") that replaces the 2007 Agreement, although he has not been able to produce a signed copy of it. *Id.* ¶¶ 31-32.

The non-competition agreement is significant because Buckley alleges that it interfered with his subsequent attempts to gain employment. After leaving PEAK6, Buckley entered into conversations with Investools, Inc. ("Investools"), the investor education arm of Thinkorswim, an options trader and division of TD Ameritrade, Inc, about potential employment. *Id.* ¶ 62. On July 21, Joe Kinahan, the Managing Director of Live Events for Thinkorswim, offered Buckley a job at Investools. Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. Z ("Buckley Dep."), at 264:4-24. Buckley testified that he accepted the job immediately and was told that he had been hired. *Id.* at 266:4-11. Kinahan, by contrast, testified that he told Buckley that Investools would have to check with Buckley's previous employer before the offer was final. Dkt. No. 72 ("Def.'s

3

Mem. Law Supp. Mot. Summ. J."), Ex. AA ("Kinahan Dep."), at 24:1-5.

On July 22, the CEO of Thinkorswim, Tom Sosnoff, called Buckley's former supervisor at PEAK6, Matt Hulsizer. Dkt. No. 84 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts"), Ex. 66. During their conversation, Hulsizer told Sosnoff that he "believed [Buckley] would have a noncompete." Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. AC ("Hulsizer Dep.") 84:15-21. The next day Kinahan called Buckley and told him that his job offer was rescinded. Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶ 69; Dkt. No. 92 ("Def.'s Resp. to Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 17. Shortly thereafter, Buckley contacted Hulsizer, who told him that he would not waive the non-competition agreement. Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶ 71. Subsequently, Kinahan emailed Buckley to inform him that he'd be "interested in doing something once the waters clear" on the non-competition agreement. Dkt. No. 84 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts"), Ex. 65.

III. Buckley's Employment at Options University

Buckley next applied for and obtained a position at Options University Group, LLC ("Options University"), an investor education firm. Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶ 73. On April 1, 2010, PEAK6 sent a letter to Options University asking Options University to remove information from its website that it stated violated PEAK6's confidentiality agreement with Buckley. *Id.* ¶ 74. The letter also threatened legal action if Options University did not comply. Subsequent discussions between the two parties resolved the issue without litigation, and Options University removed the offending items. *Id.* ¶¶ 75, 77. Brett Fogle, the President of Options University, stated that the threat of litigation from PEAK6 "frightened" him, that the removal of the information from the website "negatively impacted the sales of the campaign Buckley was

4

responsible for," and that the reduction in revenue "impacted Buckley's contractual relationship with Options University because he was being compensated on [sic] commission basis." Dkt. No. 84 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts"), Ex. N ¶¶ 7, 11-12.

## LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts before it in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## ANALYSIS

I.  Count 1: Tortious Interference with Contractual Relations—Investools

Count 1 alleges that PEAK6[1] tortiously interfered with Buckley's employment contract with Investools. To succeed on a claim for tortious interference with contractual relations, Buckley must show "(1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005).

There is conflicting evidence as to whether Buckley entered into an employment contract with Investools during his phone conversation with Kinahan. Kinahan stated in his deposition that

---

[1] The court will refer to the defendants collectively as "PEAK6."

he conditioned the offer of employment on a reference check. Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. AA ("Kinahan Dep.") 25:1-5 ("I think I was very clear with [Buckley] as to the fact that we would have to check things."). Buckley, by contrast, understood that he had accepted a final offer of employment from Kinahan. Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J.), Ex. Z ("Buckley Dep.") 264:1-24 (stating that he accepted a job offer from Kinahan). That dispute is not material. Even resolving it in Buckley's favor, the employment contract Buckley had with Investools was an at-will contract. *See id.* 266:4-267:1. Moreover, in Illinois "'[a] defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations.'" *Cody*, 409 F.3d at 859 (alteration in original) (citations omitted).

Buckley argues that at least two Illinois cases allow claims for interference with an at-will contract. *See Hi-Tek Consulting Servs., Inc. v. Bar-Nahum*, 578 N.E.2d 993, 997 (Ill. App. Ct. 1991); *Kemper v. Worcester*, 435 N.E.2d 827, 830 (Ill. App. Ct. 1982). But there is authority on the other side, *see Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877 (Ill. 1991) (noting the conflict and citing cases), and, in any event, this court is bound by the Seventh Circuit's determination of Illinois law in *Cody*. The court grants summary judgment for PEAK6 on Count 1, which is dismissed with prejudice. Buckley's motion for summary judgment on Count 1 is denied.

II.     Count 2: Tortious Interference with a Prospective Business Relationship—Investools

Count 2 alleges that PEAK6 tortiously interfered with Buckley's prospective business relationship with Investools. For Count 2, Buckley need not prove the existence of a contract, for a claim for tortious interference with a prospective business relationship requires that the plaintiff

6

have only a "reasonable expectation of entering into a valid business relationship."[2] The court need not, however, address the factual disagreements affecting the reasonableness of Buckley's expectation of employment with Investools. Even assuming that the evidence shows that Buckley had a reasonable expectation of employment, Hulsizer's comments to Sosnoff that allegedly interfered with that expectation were conditionally privileged.

In Illinois, a defendant's statement is privileged from a claim for tortious interference "if the defendant acted in good faith to protect an interest or uphold a duty." *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171 (7th Cir. 1993). Moreover, "the defendant's statement must be limited in scope to that purpose, and must be made on a proper occasion, in a proper manner and to proper parties only." *Id.* An employer's response to inquiries from prospective employers of its employees qualifies for the privilege, *id.* at 171-72, as does a statement made to enforce a non-competition agreement, *see Del Monte Fresh Produce, Inc. v. Kinnavy*, 2010 WL 1172565, at *4 (N.D. Ill. Mar. 22, 2010) (No. 07-C-5902) (Hibbler, J.). Hulsizer's comments to Sosnoff thus qualify for the privilege.

That conclusion does not end the inquiry, however. Once a privilege is established, the plaintiff may nonetheless prevail by showing that the defendant acted with malice, such as "by making unjustified statements, by excessive publication of statements, or by making statements in conflict with the interest which gave rise to the privilege." *Delloma*, 996 F.2d at 172. A defendant who knows that the statements are false is unjustified in making them. *Id.*

---

[2] *Fellhauer*, 568 N.E.2d at 878. The claim also requires proof of "(2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Id.*

Buckley contends that Hulsizer knowingly made three false statements to Sosnoff that led to the rescission of Buckley's job offer. First, Buckley argues that Hulsizer told Sosnoff that he objected to Buckley's employment because Buckley was under a non-competition agreement, when in fact Buckley's non-competition agreement did not apply to Buckley's prospective position with Investools. There is no evidence, however, that Hulsizer made any such comment. At his deposition, Hulsizer stated that he told Sosnoff only that he "believed [Buckley] would have a noncompete." Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. AC ("Hulsizer Dep.") 84:15-21. That comment was accurate. Buckley was subject to either the 2007 Agreement or the 2009 Agreement, even though the parties cannot agree about which one was applicable. Buckley's insistence that his non-competition agreement did not cover his position with Investools is beside the point, as there is no evidence that Hulsizer represented otherwise to Sosnoff.[3]

Buckley next urges the court to consider that, according to Buckley's sworn statement, Sosnoff told Buckley that Hulsizer "had brought up the noncompete and told [Sosnoff] that he would enforce a non-compete." Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. W ("Defendant's Interrogatories"), at 17. There is an evidentiary question whether the statement is inadmissable hearsay, and on summary judgment the court can consider only evidence admissible

---

[3] In an attempt to show that Hulsizer lied, Buckley also points to Hulsizer's admission in his amended answer to the complaint: "That on July 27, 2009, Buckley called and spoke with Hulsizer and asked why Hulsizer had objected to Buckley's employment with Investools, Inc. Hulsizer informed Buckley his employment with Investools, Inc. violated the [2007] Agreement." Dkt. No. 21 ¶38; *see also* Dkt. No. 84 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts"), Ex. 74 ("Def.'s Resp. to Pl.'s First Set of Reqs. to Admit") ¶ 9. The admission does not, however, state that Hulsizer told Sosnoff that Buckley's employment violated the non-competition agreement. Instead, it states only that Hulsizer told Buckley that. Indeed, Hulsizer explicitly declined to admit that he told Sosnoff that Buckley's employment would violate the non-competition agreement. Def.'s Resp. to Pl.'s First Set of Reqs. to Admit ¶ 8. The admission thus provides no evidence that Hulsizer lied about the non-competition agreement to Sosnoff.

8

at trial. *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). Resolving the question in Buckley's favor and considering the statement admitted in evidence, the statement does not assist Buckley in showing that Hulsizer lied. The statement that Hulsizer would enforce Buckley's non-competition agreement does not represent anything about the agreement's applicability to Buckley's employment with Investools or about the scope of the agreement. Instead, it merely states Hulsizer's intention to enforce the agreement to the extent possible, which he was entitled to do.

Third, Buckley asserts that Hulsizer lied by telling Sosnoff that Buckley did not get along well with his co-workers. The only indication that Hulsizer made that comment is Kinahan's testimony about Sosnoff's report of his conversation with Hulsizer. *See* Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. AC ("Hulsizer Dep.") 33-34. Kinahan's statement is clearly inadmissible hearsay, and cannot be considered on summary judgment. Even if we assume that Hulsizer did tell Sosnoff that Buckley did not get along with his co-workers, however, that comment is a statement of opinion that is not falsifiable.[4] It cannot constitute a false statement sufficient to vitiate PEAK6's privilege.

Because Hulsizer's comments to Sosnoff were privileged, they cannot form the basis of a claim that PEAK6 tortiously interfered with Buckley's prospective employment with Investools. The court thus grants PEAK6's motion for summary judgment on Count 2, which is dismissed, and denies Buckley's motion for summary judgment on Count 2.

III. Count 4: Breach of Contract

---

[4] *Cf. Sullivan v. Conway*, 157 F.3d 1092, 1097 (7th Cir. 1998) (stating that an opinion cannot form the basis of a defamation claim because an opinion "is so difficult to verify or refute that it cannot feasibly be made a subject of inquiry by a jury").

Count 4 alleges that Peak 6 violated the 2009 Agreement by failing to pay Buckley a "Restricted Period Payment." Even assuming that the 2009 Agreement applies, the evidence does not show that PEAK6 breached it. The 2009 Agreement provides that Buckley would receive the Restricted Period Payment only during the "Restricted Period." Dkt. No. 84 ("Pl.'s Local R. 56.1(b)(3)(C) Stmt of Add'l Facts"), Ex. 7 ¶ 2. The Restricted Period is "the 0, 3, 6, 9 or 12 month period following the end of [the employee's] employment with PEAK6, as elected by PEAK6 within 10 days following the end of [the employee's] employment." *Id.* ¶ 1(a). Here, however, there is no evidence that PEAK6 elected to impose a Restricted Period within the 10 day period, so Buckley is not entitled to a Restricted Period Payment.

Buckley contends that Hulsizer's comments to Sosnoff during the July 22, 2009 phone call indicated that PEAK6 wanted to enforce the non-competition agreement, that they took "the benefit of the bargain," and that they are obligated to elect a Restricted Period and make the Restricted Period Payment. The court disagrees. Buckley's last day of employment was July 10, 2009. Dkt. No. 92 ("Def.'s Resp. to Pl.'s Local R. 56.1(b)(3)(C) Stmt. of Add'l Facts") ¶ 9. The July 22 conversation occurred more than 10 days after the end of Buckley's employment, and thus outside the period when PEAK6 could elect a Restricted Period. Without an election within the 10-day time frame, there was no Restricted Period and no obligation to make a Restricted Period Payment. The court thus grants summary judgment for PEAK6 on Claim 4, which is dismissed with prejudice.

IV. Count 5: Tortious Inteference with Contractual Relations—Options University

Count 5 alleges that PEAK6 tortiously interfered with Buckley's contractual relationship with Options University. Again, to prove tortious interference with contractual relations, Buckley must show "(1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the

10

intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody*, 409 F.3d at 859. Buckley's claim fails because there is no evidence of a breach of Buckley's contract with Options University. Indeed, Buckley concedes that the contract was not breached. *See* Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶ 79. Instead, he contends that his contractual relationship with Options University was "harmed." Dkt. No. 81 ("Pl.'s Resp. Opp'n Def.'s Mot. Summ. J.") 12. Specifically, he contends that PEAK6's letter to Options University caused Options University to remove promotional material about Buckley from its website, and that the absence of that material hurt Buckley's sales. *Id.* Moreover, because Buckley's contract with Options University provided that he be compensated on commission, the decline in sales harmed Buckley's contract. *Id.*

Buckley's theory is creative, but unavailing. Even overlooking the absence of evidence that Buckley's sales decreased, mere "harm" is not enough. A tortious interference with contractual relations claim requires *a breach* of a contract. Again, Buckley has presented no evidence of a breach here. The court thus grants PEAK6 summary judgment on Count 5.

V. Count 3: Intentional Infliction of Emotional Distress

Count 3 alleges that PEAK6 intentionally inflicted emotional distress on Buckley by interfering with his employment with Investools and Options University. For a plaintiff to succeed on such a claim in Illinois, "'(1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress and (3) the conduct must in fact cause severe emotional distress.'" *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008) (quoting *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)). To meet that threshold, "the

11

defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community." *Id.* at 747.

Here, the evidence shows that PEAK6's conduct was far from outrageous or extreme. PEAK6's sole interaction with Investools involved Hulsizer's response to Investool's inquiry about PEAK6's former employee Buckley. His response was reasonable, noting the existence of a non-competition agreement with Buckley and providing an opinion about Buckley's ability to work with others. Such actions are routine, and far from outrageous.

Nor are PEAK6's interactions with Options University outrageous or extreme. PEAK6 sent Options University a demand letter asking Options University to remove information from its website that it stated violated PEAK6's confidentiality agreement with Buckley. Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶ 74. The matter was resolved through discussions between Options University and PEAK6, and Options University removed the offending material from its website. *Id.* ¶ 77. It is unclear whether posting the information on the website in fact violates the confidentiality agreement. *See* Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. E. Regardless, PEAK6's actions were far from outrageous. The demand letter and the subsequent negotiations were a reasonable way to resolve the dispute about the confidentiality agreement, and the dispute was, in fact, resolved. Buckley's claim is unavailing, and the court thus enters summary judgment for PEAK6 on Count 3, which is dismissed with prejudice.

VI.     Count 6: Violation of 38 U.S.C. §4316(d)

Count 6 alleges that PEAK6 violated USERRA by forcing Buckley to use paid vacation time during his time off for military service. Specifically, Buckley alleges that Peak 6 violated 38 U.S.C. § 4316(d), which provides that

> [a]ny person whose employment with an employer is interrupted by a period of service in the uniformed services shall be permitted, upon request of that person, to use during such period of service any vacation, annual, or similar leave with pay accrued by the person before the commencement of such service. No employer may require any such person to use vacation, annual, or similar leave during such period of service.

According to Buckley, PEAK6 violated that provision by requiring employees to take vacation time if their military leave lasted longer than fifteen days. The evidence does not support Buckley's allegation. PEAK6's "Vacation Time Policy" permits, but does not require, an employee to use vacation time while away on military leave. Dkt. No. 72 ("Def.'s Mem. Law Supp. Mot. Summ. J."), Ex. H, at 3. In other words, the employee has the option of using vacation time, in compliance with §4316(b). Of course, the employee will be fully paid for his time away only if he elects to use vacation time, *id.*, but that limitation does not violate USERRA, which does not require employers to pay employees on military leave.[5]

Moreover, Buckley has not presented any evidence that PEAK6's policy was applied to him in a way inconsistent with USERRA's requirements. None of Buckley's requests for military leave or vacation time were denied, and Buckley received his full salary without any deductions for time off. *See* Dkt. No. 83 ("Pl.'s Local R. 56.1(b)(3) Resp.") ¶¶ 43, 44, 46. Buckley's contention that PEAK6 did not communicate a formal approval of his requests is not enough to show a violation of USERRA, given the lack of evidence that PEAK6 actually prevented Buckley from taking the time off. The court grants PEAK6 summary judgment on Count 6, which is dismissed with prejudice.

---

[5] *See* 38 U.S.C. § 4316(b)(1) (providing that employees who are absent while serving in the military must be deemed to be on furlough or leave of absence with the same rights and benefits as similarly situated non-military employees, but not providing that they must be paid); Kathryn Piscitelli & Edward Still, *The USERRA Manual* § 3:5 (2011) (stating that "[g]enerally, USERRA does not require employers to pay employees wages for time spent performing military service" except in limited situations not relevant here).

VII.    Count 7: Violation of 38 U.S.C. §4311(a), (b)

Finally, Buckley alleges in Count 7 that PEAK6 violated two other provisions of USERRA, 38 U.S.C. §4311(a), which prevents an employer from denying "initial employment, reemployment, retention in employment, promotion, or any benefit of employment" to an employee on account of the employee's military service, and 38 U.S.C. §4311(b), which prevents an employer from "discriminat[ing] in employment against or tak[ing] adverse employment action against" an employee on account of his military service. Buckley has not pointed to any evidence indicating that PEAK6 took an adverse employment action of any kind against him because of his military service. At most, he has merely shown that he decided to leave the military reserves because of the demands of his job at PEAK6. Demands of an employer that conflict with military service are not actionable under §4311, however, in the absence of evidence that the employer took an adverse employment action against the employee for failing to meet them. There is no such evidence here. The court thus grants PEAK6 summary judgment on Count 7, which is dismissed with prejudice.

## CONCLUSION

For the reasons explained above, the defendants' Motion for Summary Judgment (Dkt. No. 71) is granted. Buckley's Motion for Partial Summary Judgment on Plaintiff's Claims for Tortious Interference (Dkt. No. 75) is denied. Judgment is entered in favor of the defendants on all of Buckley's claims against them.

Date: October 27, 2011                ENTER:

                                                          JAMES F. HOLDERMAN
                                                          Chief Judge, United States District Court